William COX, Plaintiff-Appellant,

v.

T. D. McNEAL et al.,
Defendants-Respondents.

No. 39738.

Missouri Court of Appeals,
Eastern District,
Division One.

Jan. 16, 1979.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Feb. 16, 1979.

Application to Transfer Denied
April 10, 1979.

C. John Pleban, London, Greenberg & Fleming, St. Louis, for plaintiff-appellant.

David O. Danis, St. Louis, for defendants-respondents.

SMITH, Judge.

Plaintiff police officer appeals his dismissal by the Board of Police Commissioners following a hearing. The Circuit Court affirmed the action of the Board.

Rather than set forth a lengthy recitation of the evidence, we incorporate in haec verba the Decision of the Board including its Statement, Findings of Fact, and Conclusions of Law and omitting its Order.

## "DECISION STATEMENT

This matter was brought before the Board of Police Commissioners for a hearing on Charges and Specifications prepared and filed by the office of the Inspector of Police, Bureau of Inspections, charges dated originally July 27, 1976 and amended August 17, 1976. The matter first came for hearing on October 4, 1976, was continued

and resumed on November 15, 16, 17 and 19, 1976. A total of thirty-nine (39) witnesses were called and twenty-five (25) exhibits were admitted into evidence, including plaintiff's exhibits one through fourteen, sixteen, seventeen, twenty, twenty-three and twenty-four, and defendant's exhibits A through D.

Both parties received reasonable notice of the issues involved and the time and the place for the hearing. Both parties were permitted timely process for the production of witnesses and documents. The parties were each represented by legal counsel. Both parties presented oral evidence. At the conclusion of the evidence in the matter, it was taken under submission for consideration by Hearing Officer Anthony Sestric. Subsequently, the hearing officer submitted recommended Findings of Fact and Recommendation to this Board. Thereafter, this recommendation, the charges and specifications and the full transcript of the proceedings were reviewed and duly considered by all members of the Board of Police Commissioners: Colonel Theodore McNeal, President; Colonel Edward J. Walsh, Jr.; Colonel George T. Mchan, Jr.; and Colonel Salees Seddon. After determination of the guilt, the Board requested, received, reviewed and considered defendant's past record with the Department.

Upon due deliberation and consideration of the charges and the plea thereof and the proof adduced, the Board in reviewing the record as a whole now makes its final decision together with the Findings of Fact, Conclusions of Law and Order as exhibited.

## FINDINGS OF FACT

1. Officer William Cox became a member of the Metropolitan St. Louis Police Department on February 3, 1958. He was assigned to the Homicide Division from October 9, 1969 to December 16, 1974.

2. Officer Cox has personally known Eugene 'Papa' Kirk since about 1959 and frequently, over the years, visited with him at his place of business and in his home.

3. That the Board of Police Commissioners is the governing body and chief executive body of the Police Department of the City of St. Louis, and, as such, has published and promulgated a 'Police Manual' which establishes rules of conduct for all officers of the St. Louis Police Department.

4. Rule 7.010(c) of the Police Manual, published and promulgated by the Board of Police Commissioners of the City of St. Louis states as follows:

'Any member of the Department shall be subject to disciplinary action for the violation of the rules of conduct set forth by the Department as herein, for the violation of other rules and regulations set out in the manual, for the violations of special orders, and for violation of the orders of a superior officer.

'Every member of the Department shall, at all times, maintain reasonable standards of courtesy in their relations with the public and with other members of the Department and shall conduct themselves in such a manner that no discredit will be brought upon the Department in general or themselves in particular.

'Acts contrary to good conduct shall include, but not be limited to, the following:

'(c) Any conduct unbecoming to a member of the Department.

'(g) Borrowing, obtaining, receiving, soliciting or accepting any money, securities, properties, or other valuable things or any credit or guarantee of credit either directly or indirectly, from any tavern keeper or proprietor, any professional bondsmen, any gambler, any person liable to arrest or complaint, any person in official capacity or free on bail or any relatives or employees of such person.'

5. Section 9.001 of the Police Manual, published and promulgated by the Board of Police Commissioners of the City of St. Louis reads as follows:

In addition to the specific duties of each individual rank and position, as set forth elsewhere in this manual, the following general duty provisions are applicable to all members of the Department and must be observed:

'(g) No police information, of any nature, shall be disclosed unless it is proper and necessary under the circumstances;

'(i) Interferring with the course of justice in any fashion whatsoever is forbidden;

'(j) No advice or information shall be given to any arrested person, or to others for him, in relation to the defense or prosecution against him;

'(r) Neglect of duty, improper performance of duty, sleeping or loafing while on duty, is subject to disciplinary action.'

6. That it was generally known throughout the office of the Circuit Attorney for the City of St. Louis that Eugene 'Papa' Kirk was a narcotics King pin, and that, at least prior to July 1, 1974, William Cox possessed a personal belief that Eugene 'Papa' Kirk was in fact involved in the narcotics trade in the City of St. Louis.

7. That Eugene 'Papa' Kirk, with others, was, in fact, heavily involved in major drug traffic within the City of St. Louis.

8. That at no time after 1968 did William Cox indicate to any member of the Office of the Circuit Attorney or to any member of the St. Louis Metropolitan Police Department that William Cox was working with Eugene 'Papa' Kirk as a confidential source of information.

9. That on June 19, 1974, Alfred Scott was killed in the City of St. Louis.

10. That amongst the Police Officers assigned to the original investigation on June 19, 1974 was Officer William Cox, and that on that date, Officer Cox, with other officers, interviewed a number of witnesses at the scene of the killing and prepared a written report of their investigation.

11. That at least one witness identified one of the persons responsible for the killing as an individual known as 'Buttons' but that information did not appear in the Police Report prepared that night of June 19, 1974.

12. That on June 20, 1974 information concerning 'Buttons' became common knowledge amongst several of the Police Officers assigned to the Homicide Division of the St. Louis Metropolitan Police Department, and that information was added to the investigation report regarding the killing of Alfred Scott, by police officers other than William Cox.

13. That subsequent to June 20, 1974, William Cox telephoned Eugene 'Papa' Kirk and arranged for the arrest of 'Buttons', who was in fact the son of Eugene Kirk.

14. That after, William Cox and one other Police Officer went to a prearranged location where the voluntary surrender of 'Buttons' Kirk was made to Officer William Cox.

15. That on or about August 26, 1974 Marvin Kendrick was murdered in the City of St. Louis, Missouri.

16. That sometime shortly thereafter, William Cox was assigned to investigate the killing of Marvin Kendrick.

17. That during the course of the investigation of the killing of Marvin Kendrick, Officer William Cox spoke with Eugene 'Papa' Kirk about the investigation, concerning Odell Herron, who was a principal suspect in the killing; gave information to Eugene 'Papa' Kirk as to the status of the investigation; and suggested a means by which Eugene 'Papa' Kirk could insure that information favorable to Odell Herron was presented to the Office of the Circuit Attorney of the City of St. Louis.

18. That William Cox presented Geraldine Harris to the Office of the Assistant Circuit Attorney, where Geraldine Harris gave a statement in support of Odell Herron.

19. That during the course of the investigation and presentment of the evidence to the Grand Jury in the City of St. Louis, William Cox represented to Eugene 'Papa' Kirk that unless additional witnesses could be found, a 'no true bill' would be returned against Odell Herron.

20. That William Cox represented to members of the Office of the Circuit Attorney of the City of St. Louis that certain other witnesses favorable to the prosecution of Odell Herron could not be located.

21. That during the course of the telephone conversations, William Cox advised Eugene 'Papa' Kirk that William Cox would be able to get a no true bill on the murder warrants against Odell Herron.

22. That during the course of the investigation of the murder charge against Odell Herron, William Cox failed to produce witnesses favorable to the prosecution, which witnesses were in fact available for presentment.

23. That the ultimate result of the Grand Jury investigation of the murder charge against Odell Herron, during that period of time when William Cox was involved, was a no true bill, and Odell Herron was discharged.

24. That in the Fall of 1975, Odell Herron was rearrested for the murder of Marvin Kendrick, that police officers, other than William Cox, reinvestigated the circumstances, interviewed all the witnesses, presented all the witnesses before the Grand Jury; that the Grand Jury did in fact return an indictment; and that these charges are still pending before the Circuit Court of the City of St. Louis.

25. That the only reasonable conclusion as to William Cox's intentions to the Marvin Kendricks murder was that William Cox was in fact attempting to influence the investigation of the killing of Marvin Kendrick as a personal favor and at the personal request of Eugene 'Papa' Kirk.

26. That prior to October 1, 1974, William Cox, on numerous occasions, visited with Eugene 'Papa' Kirk in his home and in business establishment, and communicated with Eugene Kirk by telephone, both at his home and at his place of business.

27. That during the month of October, 1974, William Cox spoke with L. R. Stafford, a Probation and Parole Officer for the State of Missouri, who was then in charge of supervising the parole and probation of 'Buttons' Kirk, son of Eugene 'Papa' Kirk.

28. That during the month of October, 1974, L. R. Stafford indicated to William Cox that it was the intention of L. R. Stafford to begin proceeding to revoke the parole and probation of 'Buttons' Kirk, and that William Cox communicated this information to Eugene 'Papa' Kirk, prior to L. R. Stafford having made actual application to the Circuit Court of the City of St. Louis.

29. That William Cox advised Eugene 'Papa' Kirk that William Cox believed that he could get the parole and probation revocation stopped for the benefit of 'Buttons' Kirk.

30. That prior to October 1, 1974, Eugene 'Papa' Kirk had offered to William Cox 'female companship', the purpose of which was sexual intercourse, and that Eugene 'Papa' Kirk provided both the 'female' and the premises for William Cox to take advantage of the 'female companionship', and that William Cox did in fact go to the premises provided by Eugene 'Papa' Kirk with the female.

31. That during the month of October, 1974, the Federal District Court for the Eastern District of Missouri authorized a 'wire tap' on certain telephones assigned to Eugene 'Papa' Kirk and did during the month of October, 1974, intercept telephonic conversations between Eugene 'Papa' Kirk and William Cox.

32. That during the month of October, 1974, as evidenced by the telephone interceptions, William Cox requested the assistance of Eugene 'Papa' Kirk in securing a wedding anniversary gift for the wife of William Cox.

33. That on or about October 20, 1974, William Cox and Raymond Bruntrager, then an Assistant Circuit Attorney for the City of St. Louis, had a brief conversation about the large number of murders which appear to have some association with drug traffic in the City of St. Louis, and William Cox advised Raymond Bruntrager that he would 'go out on the streets' to determine if any information would be available concerning such an association.

34. That no information was subsequently given by William Cox to Raymond Bruntrager or any other member of the staff of the Office of the Circuit Attorney for the City of St. Louis concerning any

association between any homicides and the drug traffic in St. Louis.

35. No evidence was presented to indicate in any way whatsoever that any member of the Police Department of the City of St. Louis, except William Cox, had intentionally given any current police information to any individual outside the Police Department itself.

36. That it is generally believed by police officers that it is bad police practice to indicate that the police officer will do what he can to thwart an investigation, and to give that impression to any suspect or 'informant'.

37. James E. Schultz, a retired St. Louis Police Department Officer, is the only officer to testify that Cox used Kirk as a source of information to solve a crime, but the last time Schultz had any such information as to Cox's use of Kirk was 1967.

38. That on April 4, 1975, William Cox, in a District Police Station of the City of St. Louis, in the presence of and in front of the other police officers in the Sixth District Station, yelled, 'Chancellor, you cock sucker you' and that phrase was shouted at John Chancellor, then as Assistant Circuit Attorney for the City of St. Louis.

39. That immediately thereafter, William Cox verbally accosted John Chancellor, outside the presence of other police officers and accused John Chancellor of lying to law enforcement officials.

## CONCLUSIONS OF LAW

1. At all times mentioned in the Findings of Fact, the Defendant lawfully occupied the rank of police officer of the St. Louis Metropolitan Police Department and as result was within the lawful discipline and government of the Department.

2. The Board of Police Commissioners of the City of St. Louis is possessed of the lawful power to make such rules and regulations consistent with law, for the government and discipline of the St. Louis Metropolitan Police Department; and, included within such right is the right to publish rules and regulations, including Rule 7.010 and all sub-parts, and rule 9.001 and all sub-parts, and to discipline officers upon competent proof that the officer violated said rules or orders.

3. As a result of the defendant's aforesaid status and the aforesaid power of the Board, the Board is possessed of the right to hear and determine the truth of the charges made against the defendant and to render a decision based upon a hearing or trial.

4. The Board has the right to affect the status of the defendant by dropping him from the rolls of the St. Louis Metropolitan Police Department, by reason of the legal authority conferred upon the Board of Police Commissioners of the City of St. Louis.

5. The Board was entitled to issue timely notice of the hearing, the (sic) conduct a hearing, and take and hear any and all evidence by the parties and to utilize all competent and material evidence in rendering its decision.

6. The Board, as an administrative agency of the Government, has the right to apply its reasonable judgment and discretion, based upon its experience in the government and administration of the Department, to the evidence adduced at the trial of the defendant herein, and in determining the proper disposition of the status of the defendant.

7. The defendant was guilty of Charges I, III, IV and VI, of violating Rule 7.010(c) and (g) and Rule 9.001(g), (i), (j) and (r), inclusive, as set out in Charges I, III, IV and VI, and their specifications.[1]

8. That punishment by dropping the defendant from the rolls of the Metropolitan St. Louis Police Department is a reasonable exercise of the Board's authority considering the officer's conduct in this case and his prior record."

■ Plaintiff raises six points on appeal, four of which may be dealt with summarily. We conclude from our review of the extensive record in this case that the findings of the Board were fully supported by substan-

---

1. Charges I, III, IV and VI have been attached as an addendum to this opinion.

tial evidence. Plaintiff's main contention that the findings were unsupported is his contention that no witness identified the voice on the tape recordings as that of Eugene Kirk, Sr. Even if this were true it overlooks the stipulation by plaintiff's counsel at a pre-hearing conference, held to determine the admissibility of exhibits, that the voice ·on the tape was in fact the voice of Kirk. In view of this stipulation it was unnecessary that any further identification of the voice be made. We reject plaintiff's contention that the Board findings were not supported by the evidence.

■ Plaintiff also complains of the Board's failure to allow plaintiff to inspect the police department internal file of the investigation of the charges against plaintiff. Plaintiff was furnished with a list of witnesses and a transcript of his own statements. The hearing was pursuant to the provisions of Chapter 536, R.S.Mo.1969, Administrative Procedure and Review. There is no provision in that chapter for the type of discovery sought by plaintiff and refused by the Board. *National Advertising Company v. State Highway Commission*, 549 S.W.2d 536 (Mo.App.1977).

Plaintiff's next point is that the Board, through the hearing officer, erred in failing to strike the testimony of Odell Herron, when the witness, on cross-examination, invoked his Fifth Amendment privilege not to testify. The hearing officer in his report to the Board, after the hearing was concluded, sustained the objection and ordered all of Herron's testimony stricken. Plaintiff's present contention of error is simply contrary to the record.

■ Plaintiff's next point is that the Board erred in admitting into evidence transcripts of the tapes of the telephone communication between plaintiff and Kirk, because the tapes themselves were available and constituted the best evidence of the conversations. In fact, the tapes were introduced into evidence. The transcripts were properly identified and the method and accuracy of their preparation was testified to. No contention was raised in the hearing or here that they are not accurate or what if any errors are present. The transcripts were simply an aid and a convenience to the Board during the trial. *United States v. Turner*, 528 F.2d 143 (9 Cir. 1975) [44–47] and *Baysinger v. State*, 550 S.W.2d 445 (Ark.1977) [6] are sound and applicable here. We find no error in the admission into evidence of the transcripts.

■ Plaintiff's next point is somewhat more complex. As a part of the police department investigation, plaintiff was interrogated by an officer of the internal affairs department. Prior to that interrogation plaintiff was warned that he was entitled to invoke his Fifth Amendment privileges but that his refusal to answer questions could subject him to disciplinary action including dismissal. He was also advised that if he chose to answer the questions his responses could be utilized against him in a disciplinary proceeding but could not be used against him in any criminal proceeding. Plaintiff elected to answer the questions and his answers were used against him in the disciplinary proceedings. Plaintiff does not challenge this procedure.

At the hearing plaintiff elected to testify and was sworn. At that juncture, and before any testimony of plaintiff, the attorney for the department advised the hearing officer, plaintiff, and plaintiff's counsel that if plaintiff's testimony at the hearing was incriminating it would be .turned over to prosecuting authorities for possible submission to a grand jury, and urged that plaintiff be advised of his Fifth Amendment rights. After consultation with his attorney, plaintiff decided not to testify and the hearing officer announced that no inference would be drawn from his refusal to so testify. Plaintiff asserts that this action by the department's attorney placed him between "The rock and a whirlpool" condemned in *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); *Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967); *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968); *Uniformed Sanitation Men Assn. Inc. v. Commissioner of Sanitation*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968). We

disagree. Those cases all involve situations in which the individual was required to answer questions to avoid loss of employment and where the answers so given were or could be used to prosecute him for crimes revealed. That is not the case here. Plaintiff was not threatened with loss of employment if he failed to testify at the hearing solely because of such failure to testify. What he lost was an opportunity to testify in his own defense. But this lost opportunity is exactly what any individual involved in litigation loses when he elects not to testify. The Fifth Amendment gives no protection from that loss.

■ Nor was the initial interrogation procedure contrary to the above-cited cases. The answers given by plaintiff were not to be used against him in any criminal proceeding. Both *Gardner* and *Uniformed Sanitation Men,* supra, recognize that the threat of loss of job because of failure to cooperate by answering legitimate questions directed to the employee's performance of his duties is not precluded by the Fifth Amendment if the answers cannot be used against him in a criminal proceeding. We find plaintiff's point to be without merit.

■ The final point is that the Board erred in failing to grant plaintiff's motion to suppress the recordings of the telephone conversations between plaintiff and Kirk. These recordings were obtained as a result of wire taps on Kirk's phones authorized by 18 U.S.C. §§ 2510–2520. The authorization was granted to obtain evidence on federal narcotics law violations. No contention is raised that the wire-taps were not properly authorized and that the communications were not lawfully intercepted. Plaintiff premised his motion to suppress upon the provisions of 18 U.S.C. § 2517(3)[2] and (5)[3] and his contention that those sections require an after-interception judicial authorization before testimony may be adduced concerning "offenses" not covered by the original authorization order. No such after-interception judicial authorization appears of record. The parties and the hearing officer dealt with the matter on the supposition that its resolution turned upon (1) whether evidence obtained by wire-tap could be offered at all in an administrative hearing and if so (2) whether the term "offenses" pertains to the subject matter of the hearing or of the communications intercepted. As to the first question it is clear by the 1970 amendment of Sec. 2517(3) that such evidence may be used in "any proceeding held under the authority of the United States or of any State or political subdivision thereof." This proceeding was under the authority of the statutes of the State of Missouri.

■ The second question need not be resolved. Sec. 2518(10)(a) provides that motions to suppress such evidence may be based upon three specific grounds.[4] No

---

**2.** § 2517. (3) Any person who has received, by any means authorized by this chapter, any information concerning a wire or oral communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof.

**3.** § 2517. (5) When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

**4.** "(i) the communication was unlawfully intercepted;

(ii) the order or authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval."

challenge has been made to the wire-taps here on any of those three grounds. The provisions of the law in question deal with two distinct areas: unlawful interception and unlawful disclosure. The federal courts have consistently held that a motion to suppress lies only for unlawful interception, not for unlawful disclosure. For the latter the proper relief is through a civil cause of action. 18 U.S.C. § 2520. *See United States v. Iannelli*, 477 F.2d 999 (3 Cir. 1973); *United States v. Vento*, 533 F.2d 838 (3 Cir. 1976); *United States v. Rabstein*, 554 F.2d 190 (5 Cir. 1977). The purpose of the disclosure provisions of Sec. 2517 is to preclude investigatory authorities from obtaining an order for wire interception upon allegations of one crime when in fact they are seeking evidence of an entirely different crime for which they cannot obtain authority to intercept. *United States v. Aloi*, 449 F.Supp. 698 (E.D.N.Y.1977) [22]. If such a state of affairs was established by the evidence, suppression might be the proper remedy, not because the disclosure is unlawful but because the interception was. There is neither contention nor the slightest shred of evidence that the interception here was a subterfuge. In fact the evidence establishes the contrary. Plaintiff's motion was directed to alleged unlawful disclosure, not unlawful interception. The statute does not require suppression in that situation and the Board did not err in admitting the evidence.

Judgment affirmed.

WEIER, C. J., and SNYDER, P. J., concur.

## ADDENDUM

"CHARGE I    Police Officer William Cox, Department Serial Number 2855, a member of the Metropolitan Police Department of the City of St. Louis, Missouri while assigned to the Sixth District, did violate Rule 7, Section 7.010(c) of the Police Manual, published July, 1970 by the Board of Police Commissioners, which rule in applicable part provides that an officer may be disciplined for 'Conduct unbecoming to a member of the Department', by associating with and making several phone calls to Eugene Kirk, Sr., a known narcotics 'king pin' in the St. Louis area, contrary to the good order and discipline of the Department, and bringing discredit to himself, in particular and to the Department in general.

CHARGE I
Specification 1    Between September 1, 1974 and November 1, 1974 Police Officer William Cox, DSN 2855, associated with a known narcotics 'king pin' in the St. Louis area, known as Eugene Kirk, Sr., by meeting with Mr. Kirk at the home of Mr. Kirk and elsewhere and by making and receiving several telephone calls between himself and Mr. Kirk, when no justifiable purpose existed for Police Officer Cox maintaining such a close relationship with an individual of such known unsavory character.

CHARGE III    Police Officer William Cox, Department Serial Number 2855, a member of the Metropolitan Police Department of the City of St. Louis, Missouri, on October 7, 1974 and October 13, 1974, violated Rule 9, Section 9.001(i) of the Police Manual, published July, 1970 by the Board of Police Commissioners, which rule in applicable part provides, 'Interfering with the course of justice in any fashion whatsoever is forbidden', and Section 9.001(j) 'no advice or information shall be given to any arrested person, or others for him, in relation to the defense or prosecution against him', by informing Eugene Kirk, Sr. of the activities of a parole officer assigned to the case of the son of Eugene Kirk, Sr., contrary to the good order and discipline of the Department, and bringing discredit upon himself in particular, and to the Department in general.

CHARGE III
Specification 1    On October 7, 1974 and October 13, 1974, Police Officer William Cox, dsn 2855, had telephone conversations with Eugene Kirk, Sr., wherein Police Officer Cox told Eugene Kirk, Sr., that a new probation officer who had been assigned to the case of *Buttons* Kirk was going to try to have Buttons Kirk's probation revoked, and Police Officer Cox supplied Eugene Kirk, Sr., with the name of the new probation officer who was taking this action.

**CHARGE IV** Police Officer William Cox, Department Serial Number 2855, a member of the Metropolitan Police Department of the City of St. Louis, Missouri, violated the following sections of the Police Manual, published July, 1970 by the Board of Police Commissioners: Rule 9, Section 9.001(r) 'Neglect of duty, improper performance of duty, sleeping or loafing while on duty,' is subject to disciplinary action; Section 9.001(g) 'No police information, of any nature, shall be disclosed unless it is proper and necessary under the circumstances'; Section 9.001(i) 'Interfering with the course of justice in any fashion whatsoever is forbidden; Section 9.001(j) 'No advice or information shall be given to any arrested person, or others for him, in relation to the defense or prosecution against him'; Rule 7, Section 7.010(g) 'Borrowing, obtaining, receiving, soliciting or accepting any money, securities, property, or other valuable thing or any credit or guarantee of credit either directly or indirectly, from any tavern keeper or proprietor, any professional bondsman, any gambler, any person liable to arrest or complaint, any person in official custody or free on bail or any relatives or employees of such persons', in that during the investigation of a homicide and assault, which took place at 6107 West Florissant, on August 26, 1974, by conversing with Eugene Kirk, Sr., during the course of the investigation and the Grand Jury Hearing, supplied Eugene Kirk, Sr., with information concerning the investigation and indicating to Eugene Kirk, Sr., that he would attempt to have the case nolle prossed, and Police Officer Cox produced evidence to authorities which was designed to have the case dismissed, and Police Officer Cox solicited female companionship and gifts from Eugene Kirk, Sr. during the course of this investigation, during this time Eugene Kirk, Sr., had expressed to Police Officer Cox his interest in the arrested subject Odell Herron, contrary to the good order and discipline of the Department, and bringing discredit to himself in particular and to the Department in general.

**CHARGE IV**
**Specification 1** Police Officer William Cox, dsn 2855, during the investigation of a murder which took place on August 26, 1974 at 6107 West Florissant, made contact with Eugene Kirk, Sr., at which time Eugene Kirk, Sr., indicated to Police Officer Cox that he was interested in helping the arrested subject Odell Herron. Police Officer Cox kept Eugene Kirk, Sr. informed of the developments of the investigation and the search for witnesses to the murder and indicated during a telephone conversation on October 13, 1974 that he should be able to get the case nolle prossed after he, Cox, testified that a witness had been threatened. Police Officer Cox further told Eugene Kirk, Sr. that he had primed the Assistant Circuit Attorney that he should get this case taken care of on the 23rd of October, 1974. Also, during the investigation, Police Officer Cox was provided with female companionship by Eugene Kirk, Sr., and solicited from Eugene Kirk, Sr., additional female companionship in return for Officer Cox interceding in the investigation to assist Odell Herron, a friend of Eugene Kirk, Sr.

**CHARGE VI** Police Officer William Cox, Department Serial Number 2855, a member of the Metropolitan Police Department of the City of St. Louis, Missouri, violated Rule 7, Section 7.010(c) of the Police Manual, published July, 1970 by the Board of Police Commissioners, which rule in applicable part provides 'Any conduct unbecoming to a member of the Department', by verbally accosting a member of the Circuit Attorney's Staff on April 4, 1975.

**CHARGE VI**
**Specification 1** On April 4, 1975, in the Sixth District Police Station, Police Officer William Cox, dsn 2855, confronted Mr. John Channcelor, an Assistant Circuit Attorney in the City of St. Louis, Missouri, and hollered at Mr. Channcelor, 'Channcelor, you cock-sucker, did you testify against me in the Grand Jury.' "